UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

JOAN RENEE WILDER,

        Plaintiff,

v.

COMMISSIONER OF
SOCIAL SECURITY
ADMINISTRATION,

        Defendant.

_____/

Case No. 2:18-cv-10963
District Judge Terrence G. Berg
Magistrate Judge Anthony P. Patti

**REPORT AND RECOMMENDATION TO DENY PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT (DE 16), GRANT DEFENDANT'S MOTION FOR SUMMARY JUDGMENT (DE 17) and AFFIRM THE COMMISSIONER'S DECISION**

**I.    RECOMMENDATION**: For the reasons that follow, it is **RECOMMENDED** that the Court **DENY** Plaintiff's motion for summary judgment (DE 16), **GRANT** Defendant's motion for summary judgment (DE 17), and **AFFIRM** the Commissioner's decision.

**II.    REPORT**

    Plaintiff, Joan Renee Wilder, disputes the Social Security Administration's treatment of insurance settlement proceeds when it calculated her SSI benefits. She brings this action *in pro per* under 42 U.S.C § 1383 for review of a final decision of the Commissioner of Social Security ("Commissioner"). This matter is

before the United States Magistrate Judge for a Report and Recommendation on Plaintiff's motion for summary judgment (DE 16), the Commissioner's cross-motion for summary judgment (DE 17), Plaintiff's reply (DE 19) and the administrative record (DE 13).

## A. Background and Administrative History

In her July 30, 2012 SSI application, Plaintiff alleged that her disability began on June 23, 2011, at the age of 44. (R. at 184-192.) On April 30, 2014, ALJ Anthony R. Smereka determined that Plaintiff had been disabled since June 23, 2011, the date of a motor vehicle accident. (R. at 26, 30.) In so doing, ALJ Smereka recognized that Plaintiff had received a monetary settlement on or about February 27, 2014, which would affect her SSI eligibility, and directed Plaintiff to provide the Social Security Administration (SSA) with related documentation. (R. at 30.)[1]

On June 10, 2014, the SSA informed Plaintiff that she was entitled to a monthly $698.00 back payment from August 2012 through December 2012,

---

[1] In his decision, ALJ Smereka referred to Plaintiff's February 27, 2014 receipt of "a settlement from her motor vehicle accident . . . ." (R. at 24.) This appears to have been associated with a *second settlement*, which involved a third-party claim paid by AAA, the other driver's carrier, *i.e.*, *not the prior settlement distribution at the center of the instant appeal*. (R. at 203, 205-206; *see also* R. at 54.) On March 6, 2014, Plaintiff's bank account was credited in the amount of $94,788.00. (R. at 44.) Accordingly, Plaintiff concedes that she was ineligible for SSI thereafter. (R. at 121, 193, 203.)

2

totaling $3,490.00, but was not entitled to any back payment from January 2013 through June 2014. (R. at 79-94.) This notification included explanations of these monthly calculations, several of which refer to Plaintiff's checking account(s). (R. at 95-101.) One month later, on July 10, 2014, the SSA found that Plaintiff had "resources worth more than $2,000.00 for February 2013 through October 2013 and $2,000.00 for March 2014." (R. at 102-107.) Again, the SSA include explanations of these monthly calculations, many of which refer to Plaintiff's checking account. (R. at 108-112.)[2]

On August 13, 2014, Plaintiff requested reconsideration. (R. at 114-115; *see also* R. at 123.) Plaintiff submitted documentary evidence – counsel's settlement memorandum, Plaintiff's bank statements from 2013, and provider statements – to substantiate Plaintiff's alleged receipt of $17,557.47 in settlement proceeds and a total distribution of $16,925.00 to service providers. (R. at 121.) An informal conference was conducted on September 15, 2014. (R. at 14.) Shortly thereafter, Plaintiff submitted chore provider logs and lease agreements. (R. at 126-127.)[3] On November 5, 2014, the SSA affirmed its original decision. (R. at 139-141.)

---

[2] Oddly, the July 20, *2014* notice includes a calculation for September *2015*. (R. at 113.)

[3] On September 22, 2014, an SSA representative spoke with Plaintiff's counsel regarding settlement memoranda. (R. at 128-129.) On October 22, 2014, an SSA District Office representative spoke with an insurance company representative,

3

Plaintiff requested a hearing by an Administrative Law Judge ("ALJ"). (R. at 142-143; *see also* R. at 152-164.) Plaintiff submitted a statement of claim, which argued that benefits from January 2013 to February 2014 should be paid. (R. at 193-194.) ALJ Martha Gasparovich held a hearing on November 9, 2015, at which Plaintiff testified. (R. at 199-214.) On January 8, 2016, ALJ Gasparovich issued an opinion, which determined that Plaintiff's countable resources exceeded the allowable limit to be eligible for SSI benefits from January 2013 through March 2014. (R. at 11-19.)

Plaintiff submitted a request for review of the hearing decision. (R. at 195-198, 9-10.) However, on January 17, 2018, the Appeals Council denied Plaintiff's request for review. (R. at 4-8.) Thus, ALJ Gasparovich's decision became the Commissioner's final decision.

It is undisputed that Plaintiff timely commenced the instant action on March 23, 2018. (*See* R. at 5.)

### B. Plaintiff's Financial History

The administrative record contains several records that describe Plaintiff's finances: **(1)** Bank of America statements for February 5, 2013 – August 19, 2013 (R. at 32-37); **(2)** Bank of America statements for February 27, 2014 – April 30,

---

who, *inter alia*, seems to have confirmed that "maximum payment is $20 per day for replacement chore services." (R. at 136.)

2014 (R. at 38-44); **(3)** SSI database records of Bank of America funds for March 2013 – June 2014 (R. at 124-125); **(4)** memoranda for settlement and distribution of proceeds from QBE Insurance Corporation, *i.e.*, the settlement at the center of the instant appeal (R. at 53, 55-57); **(5)** a February 27, 2014 memorandum for settlement and distribution of proceeds from Auto Club Group Insurance Company (R. at 54); and, **(6)** SSI database queries regarding earnings (R. at 144-146, 148-151, 183).

### C.   The Administrative Decision

The issue before ALJ Gasparovich was whether Plaintiff's "countable resources exceeded the allowable limit to be eligible for [SSI] benefits from January 2013 through March 2014." (R. at 14.) In the January 8, 2016 decision, the ALJ specifically referenced:

- A July 2011 Residential Lease, between Plaintiff and C. C. Champion (Apt. 304, Madison Apts.), which indicates that monthly rent from July 2011 to September 2012 was $475.00 (R. at 45-50)

- Plaintiff's July 2012 application summary for SSI, which represents, *inter alia*, that she lived alone and her monthly rent was $300.00 (R. at 185)

- An October 2012 Residential Lease between Plaintiff and C. C. Champion (29646 Medbury St.), which indicates that monthly rent from October 2012 to March 2015 was $550.00 (R. at 51-52)

- Plaintiff's counsel's settlement memorandum regarding QBE Insurance Corporation, which substantiated payment of

> $17,557.47 to Plaintiff in January and February 2013 (R. at 55-57)

- Champion's August 2014 statement that Plaintiff's payment of $9,875, for July 2011 through February 2013, made her "current for rent due." (R. at 135; *see also* R. at 133-134)

- Jessie Epps's August 21, 2014 statement that, in February 2013, Plaintiff paid her "$5,050.00 in cash" for her services as a chore provider during 2011-2013 (R. at 116-120), as well as her replacement services itemization (R. at 58-67)

- Brian Allen Armstrong's August / October 2014 statement that, in February 2013, Plaintiff paid him $2,000.00 for his services as a chore provider during 2011-2013 (R. at 130-132), as well as his replacement services itemization (R. at 70-78, 122)

- Plaintiff's November 9, 2015 testimony (*see* R. at 199-214)

(R. at 14-15; *see also* R. at 147.) Ultimately, ALJ Gasparovich determined that "[s]tatements from the claimant's roommate and family members allege that she paid them a total of $16,925.00 in cash in February 2013, but other evidence *undermines* the reliability of these assertions." (R. at 15 (emphases added).) Thus, the ALJ concluded that there was insufficient evidence to support Plaintiff's eligibility for SSI from January 2013 through March 2014. (*Id.*)

### D. Standard of Review

The District Court has jurisdiction to review the Commissioner's final administrative decision pursuant to 42 U.S.C. § 1383(c)(3) ("The final determination of the Commissioner of Social Security after a hearing under paragraph (1) shall be subject to judicial review as provided in section 405(g) of

this title to the same extent as the Commissioner's final determinations under section 405 of this title."). When reviewing a case under the Social Security Act, the Court "must affirm the Commissioner's decision if it 'is supported by substantial evidence and was made pursuant to proper legal standards.'" *Rabbers v. Comm'r of Soc. Sec.*, 582 F.3d 647, 651 (6th Cir. 2009) (quoting *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007)); *see also* 42 U.S.C. § 405(g) ("[t]he findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive . . . ."). Under this standard, "substantial evidence is defined as 'more than a scintilla of evidence but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Rogers*, 486 F.3d at 241 (quoting *Cutlip v. Sec'y of Health & Human Servs.*, 25 F.3d 284, 286 (6th Cir. 1994)). In deciding whether substantial evidence supports the ALJ's decision, the court does "not try the case *de novo*, resolve conflicts in evidence or decide questions of credibility." *Bass v. McMahon*, 499 F.3d 506, 509 (6th Cir. 2007); *Rogers*, 486 F.3d at 247 ("It is of course for the ALJ, and not the reviewing court, to evaluate the credibility of witnesses, including that of the claimant.").

Although the substantial evidence standard is deferential, it is not trivial. The Court must "'take into account whatever in the record fairly detracts from [the] weight'" of the Commissioner's decision. *TNS, Inc. v. NLRB*, 296 F.3d 384,

395 (6th Cir. 2002) (quoting *Universal Camera Corp. v. NLRB*, 340 U.S. 474, 487 (1951)). Nevertheless, "if substantial evidence supports the ALJ's decision, this Court defers to that finding 'even if there is substantial evidence in the record that would have supported an opposite conclusion.'" *Blakley v. Comm'r of Soc. Sec.*, 581 F.3d 399, 406 (quoting *Key v. Callahan*, 109 F.3d 270, 273 (6th Cir. 1997)). Finally, even if the ALJ's decision meets the substantial evidence standard, "'a decision of the Commissioner will not be upheld where the SSA fails to follow its own regulations and where that error prejudices a claimant on the merits or deprives the claimant of a substantial right.'" *Rabbers*, 582 F.3d at 651 (quoting *Bowen v. Comm'r of Soc. Sec.*, 478 F.3d 742, 746 (6th Cir. 2007)).

### E. Analysis

Plaintiff contends that the ALJ "ignored evidence of assets," and "incorrectly assessed and assumed countable resources." (DE 16 at 8-13.) The Commissioner argues that the ALJ "properly determined that Plaintiff's countable resources exceeded the allowable limit to be eligible for SSI from January 2013 through March 2014." (DE 17 at 10-20.)

#### 1. Outgoing transactions in February 2013

Plaintiff argues that the ALJ errantly "ignored [her] outgoing transactions," when concluding that she was not eligible for SSI for February 2013. (DE 16 at 8-10.) During January 2013 and February 2013, Plaintiff received $17,557.47 of the

8

proceeds from her settlement with QBE. (R. at 55-57, 206-207.) For February 2013, the SSA determined that Plaintiff had $4,000.00 in cash. (R. at 108.)

At the administrative hearing, Plaintiff testified that she cashed the three checks but "didn't deposit them because [she] had to disburse out the cash." (R. at 208-209.) In a statement provided to the SSA, Plaintiff claimed that she paid $5,050.00 in cash to Epps for chore provider services, $2,000.00 in cash to Armstrong, and $9,875.00 in cash to Champion for back rent, each payment seemingly in February 2013 and from the QBE settlement proceeds. (R. at 117-118.) Stated otherwise, she claims to have disbursed $16,925.00 and retained only $623.47. (R. at 193.)

### a. Alleged disbursement of $9,875 to Champion for rent

In her complaint, Plaintiff takes issue with the Commissioner's treatment of her rent statement, explaining that she "had to move and [her] rent amount changed because [she] could not afford [her] old rent[.]" (DE 1 at 3.) In a statement to the SSA, Champion describes the alleged $9,875.00 payment as comprised of $2,750.00 for the Medbury St. property ($550.00 for each of 5 months, October 2012 - February 2013) and $7,125.00 for Madison Apts. (R. at 133-135.) Although there is no breakdown provided for the latter, the Court notes that it equates to $475.00 for each of 15 months (presumably July 2011 – September 2012).

9

At the administrative hearing, the ALJ examined Plaintiff about the SSI application's representations that she lived alone and had monthly rent of $300.00. (R. at 185, 209-212.)  Plaintiff denied stating that she lived alone.  (R. at 209.) Moreover, after the ALJ referenced the two aforementioned leases, which listed rents of $475.00 and $550.00, and Plaintiff's SSI application, which listed monthly rent of $300.00, Plaintiff explained that "[t]he rent went up and . . . we had back rent that was the cause of late fees and all of that."  (R. at 209-210, 45, 51.)  She also testified that Champion "must have made a mistake" when filling out the form and she "was paying $300 at that time[,]" presumably referring to her July 2012 SSI application.  (R. at 212.)  Moreover, when asked whether Champion "filled these forms out just recently in order to supply them to [the SSA][,]" Plaintiff answered, "Correct.  Whenever they asked for them is when they were supplied." (*Id.*)

On January 8, 2016, considering Plaintiff's hearing testimony, ALJ Gasparovich stated that Plaintiff:

> . . . was initially unable to explain the inconsistency between the amount of rent she reported to the [SSA] in July 2012 and the amount of rent documented in the lease agreements.  However, she later admitted that $300.00 was the correct amount[,] so Mr. Champion must have been mistaken when he drafted the lease agreements, which were not prepared in July 2011 or October 2012 as they were produced afterwards in association with this dispute.  I therefore conclude that the claimant's testimony under oath at the hearing undermines the validity of Mr. Champion's purported statements[,]

and the evidence of record as a whole fails to support a finding that
she paid him $9,875.00 in cash for past-due rent in February 2013.

(R. at 15.)

In essence, the ALJ permissibly found that "Plaintiff's testimony and her original SSI application were inconsistent with the after-the-fact lease agreements and other document[s] prepared by Mr. Champion[.]" (DE 17 at 14.) Stated otherwise, the ALJ credited Plaintiff's SSI application and testimony, each of which represented that her monthly rent was then $300.00.[4] *Hardaway v. Sec'y of Health & Human Servs.*, 823 F.2d 922, 928 (6th Cir. 1987) ("Since the ALJ has the opportunity to observe the demeanor of a witness, his conclusions with respect to credibility should not be discarded lightly and should be accorded deference.") (citing *Houston v. Secretary of Health and Human Services,* 736 F.2d 365, 367 (6th Cir.1984)). As the Commissioner aptly puts it, "[t]he ALJ reasonably determined that . . . Mr. Champion's statements were unpersuasive in demonstrating that Plaintiff spent $9,875.00 on past-due rent in February 2013." (DE 17 at 17.)

### b. Brian Allen Armstrong (Plaintiff's son)

---

[4] Contrary to Plaintiff's interpretation, the Undersigned construes Plaintiff's administrative hearing testimony as *affirming* that she paid $300.00 in rent, *consistent with* her July 2012 SSI application. (*Compare* DE 19 at 4, *with* R. at 210-212.) Incidentally, there is evidence that Plaintiff wrote a check for $300.00 in April 2013. (R. at 35.)

In a statement to the SSA, Armstrong claims to have been a chore provider for Plaintiff during 2011-2013. (R. at 130-132.) He describes the alleged February 2013 receipt of $2,000.00 from Plaintiff as compensation for services. (*Id.*) The record contains replacement service logs for Armstrong for September, October, November and December 2012, as well as December 2013 and January 2014, for which it seems that Armstrong was owed or paid $3,680.00. (R. at 70-78, 122.)

Citing Armstrong's replacement services itemizations and provider statement, the ALJ stated: "information contained in replacement service logs bearing the signatures of the claimant and Mr. Armstrong is *not consistent* with the aforementioned statement of Mr. Armstrong regarding the dates that he provided services or the amount that he was paid[.]" (R. at 15.) As the Commissioner notes in her brief, the record contains a replacement service log for January 2014, which is signed by Plaintiff and Armstrong and dated January 31, 2014; yet, Armstrong's August / October 2014 statements do not mention services for 2014. (*Compare* R. at 77-78, *with* R. at 130-132.) (DE 17 at 18.) To give the benefit of the doubt, it is conceivable that January 2014 data was omitted from Armstrong's statements, because the statements were only intended to support the alleged February 2013 payment of $2,000.00. Nonetheless, it is still the case that Armstrong's service logs do not account for services performed in 2011, a period for which his statement justified, at least in part, receipt of $2,000.00. (*Compare* R. at 70-78,

*with* R. 130-132). (DE 17 at 18.)[5] "[I]n determining whether a claimant has spent or retained excess resources, an ALJ must be free to disregard self-serving statements that cannot be verified, and the ALJ's assessment of credibility must be given great weight." *Hudson v. Bowen*, 849 F.2d 433, 434 (9th Cir. 1988).

### c. Jessie Epps (Plaintiff's mother)

In a statement to the SSA, Epps claims that she was a chore provider for Plaintiff during 2011, 2012 and 2013. (R. at 116, 119-120.) Epps represents that, in February 2013, she received $5,050.00 from Plaintiff for services. (*Id*.) The record contains replacement services and attendant care itemization for a period spanning June 24, 2011 to April 28, 2012 (R. at 58-63), December 2012 through February 2013 (R. at 64-66), and July 2013 (R. at 67). A separate chart suggests that Epps was owed or paid $5,180 for this period, although it does not appear to include an amount for January 2012. (R. at 122.)

Citing Epps's and Armstrong's replacement services itemizations and Epps's provider statement, the ALJ stated: "information contained in replacement service logs attributed to Ms. Epps identifies *duplicative services* in December

---

[5] The breakdown of the $2,000.00 is unclear to the Court. True, $2,000 might reflect 100 days at $20 per day. However, even if the Court subtracted from $3,680 the duplicate $620 for December 2012 (*see* R. at 64, 73-74, 122) and the $620 for January 2014 (*see* DE 17 at 18 n.10), it would still amount to $2,440. If the excess $440 is attributable to Armstrong's 2011 services, his statement to the SSA does not indicate that $2,000 was only partial payment for 2011-2013. (*See* R. at 130-132.)

13

2012 and *lacks consistency* with the amount she said she was paid[.]" (R. at 15 (emphases added.) Even if there is only a $130.00 difference between the $5,050.00 Epps was allegedly paid and the $5,180.00 listed on the chart as owed or paid to Epps, the record contains December 2012 service logs for Epps and Armstrong (R. at 64, 73-74), and the "services and payments" chart lists $620.00 – presumably 31 days at $20 per day – for each of these individuals for the month of December 2012 (R. at 122). To that end, a case development note reflects that "per the insurance adjuster, only $20 per day is approved for chore provider." (R. at 137-138.) Again, "the ALJ's assessment of credibility must be given great weight." *Hudson*, 849 F.2d at 434.

### d. Conclusion

Presumably referring to these payments, when asked at the hearing whether she "actually paid these monies out within the first few weeks of February, 2013[,]" Plaintiff testified, "Yes, I did." (R. at 213.) Plaintiff claims the $11,750.00 disbursement was plausible due to 35 months of unemployment, medical bills, out-of-pocket prescription payments, rent, and household expenses. (DE 16 at 9.)[6] Moreover, she points out that her bank account had a balance of

---

[6] The Court is unsure of how Plaintiff arrived at the $11,750 figure, although the Court suspects it is a combined reference to the alleged $9,875.00 and $2,000.00 payments, which totaled $11,875.00. (DE at 16 at 9.)

14

$250.00 in early February 2013, "well below the allowable $2,000 countable resource limit." (DE 16 at 10, DE 19 at 3, R. at 37.)

However, as illustrated above, it is not the case that the ALJ failed to consider her outgoing payments or ignored actual documentation of Plaintiff's resources. (DE 16 at 10.) To the contrary, the ALJ considered the alleged payments and related evidence but discounted the reliability of the statements as undermined by other evidence. (R. at 15.) Moreover, to the extent Plaintiff argues that the ALJ failed to consider Plaintiff's February 2013 bank account balance, it appears that the ending February 2013 / beginning March 2013 balance was $0.37, which the SSA considered when determining that Plaintiff was ineligible for March 2013. (R. at 37, 109.)

Plaintiff contends that "the only source to consider as a countable resource for the month of February 2013 was Wilder's bank account and not the assumed check from the lawsuit proceeds[,]" *i.e.*, the ALJ errantly assumed that "cash funds were still in Wilder's possession." (DE 16 at 10; *see also* DE 16 at 4.) The Undersigned finds, however, that the ALJ's apparent belief was supported by substantial evidence; in other words, it was a logical conclusion. Although Plaintiff's reply acknowledges the deference given to the ALJ's credibility determination, Plaintiff is not correct that the ALJ failed to properly view or consider the record "as a whole." (DE 19 at 2-5.)

15

### 2. Countable resources for March 2013 – August 2013

As the SSA communicated in its Notice of Award, "[t]o get SSI, [Plaintiff's] countable resources must not be more than the allowable limit of $2,000.00 . . . ." (R. at 81; *see also* 42 U.S.C. § 1382(a)(3)(B)). "[R]esources means cash or other liquid assets or any real or personal property that an individual (or spouse, if any) owns and could convert to cash to be used for his or her support and maintenance." 20 C.F.R. § 416.1201(a). As the SSA explains, "[r]esources include cash, bank accounts, life insurance policies, automobiles, and other property." (R. at 91, 106.)

Plaintiff argues that the SSA incorrectly assessed countable resources for March 2013 through August 2013. (DE 16 at 10-13.) In so doing, she points to bank records, which show opening bank balances each month from March 2013 through August 2013 as: **(a)** $0.37; **(b)** $5.71; **(c)** -$92.98; **(d)** -$99.98, **(e)** -$858.43; and **(f)** -$181.98. (R. at 32-37; *see also* R. at 125.) Although the SSA's initial calculation for these months did not refer to Plaintiff's checking account, the SSA subsequently determined – presumably having learned of the QBE settlement proceeds – that Plaintiff had cash of $4,000.00, in addition to bank account balances of $0.37 for March 2013 and $5.71 for April 2013. (*Compare* R. at 100, *with* R. at 108-111.) That the latter SSA calculations for March and April 2013 include the $0.37 and $5.71 balances belies an argument that the SSA did not consider Plaintiff's bank accounts. More to the point, the SSA considered cash on

hand, and the record supports a conclusion that it exceeded the permissible resource amount.

### F. Conclusion

"To be eligible for SSI under Title XVI of the Social Security Act, a claimant must not only establish that he or she is disabled, but also show income and resource limits as set forth in 42 U.S.C. §§ 1382(a)(3); 20 C.F.R. § 416.1205(c)." *Kushner v. Comm'r of Soc. Sec.*, 354 F. Supp. 3d 797, 803 (E.D. Mich. 2019). Plaintiff has not shown legal error that would upend ALJ Gasparovich's decision, and due deference must be shown to how she treated issues of credibility and inconsistency. For the foregoing reasons, it is **RECOMMENDED** that the Court **DENY** Plaintiff's motion for summary judgment (DE 16), **GRANT** Defendant's motion for summary judgment (DE 17), and **AFFIRM** the Commissioner of Social Security's decision.

### III. PROCEDURE ON OBJECTIONS

The parties to this action may object to and seek review of this Report and Recommendation, but are required to file any objections within 14 days of service, as provided for in Federal Rule of Civil Procedure 72(b)(2) and Local Rule 72.1(d). Failure to file specific objections constitutes a waiver of any further right of appeal. *Thomas v. Arn*, 474 U.S. 140 (1985); *Howard v. Sec'y of Health & Human Servs.*, 932 F.2d 505 (6th Cir. 1981). Filing objections that raise some

issues but fail to raise others with specificity will not preserve all the objections a party might have to this Report and Recommendation. *Willis v. Sec'y of Health & Hum. Servs.*, 931 F.2d 390, 401 (6th Cir. 1991); *Smith v. Detroit Fed'n of Teachers Local 231*, 829 F.2d 1370, 1273 (6th Cir. 1987). Pursuant to Local Rule 72.1(d)(2), any objections must be served on this Magistrate Judge.

Any objections must be labeled as "Objection No. 1," and "Objection No. 2," *etc.* Any objection must recite precisely the provision of this Report and Recommendation to which it pertains. Not later than 14 days after service of an objection, the opposing party may file a concise response proportionate to the objections in length and complexity. Fed. R. Civ. P. 72(b)(2); E.D. Mich. LR 72.1(d). The response must specifically address each issue raised in the objections, in the same order, and labeled as "Response to Objection No. 1," "Response to Objection No. 2," *etc.* If the Court determines that any objections are without merit, it may rule without awaiting the response.

Dated: July 8, 2019         s/*Anthony P. Patti*
                            Anthony P. Patti
                            UNITED STATES MAGISTRATE JUDGE